## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA    )
    )
    )
v.    )  Criminal Action No. _26-105-UNA_
    )
CASEY MUGGLESTON,    )  **REDACTED**
    )
Defendant.    )

**FILED**

**JUN 2 3 2026**

US DISTRICT COURT
DISTRICT OF DELAWARE

### INDICTMENT

The Grand Jury for the District of Delaware charges that:

### Introduction and General Allegations

At all times relevant to this Indictment:

### *Overview*

1. From in or around May 2024 through in or around September 2024, Defendant CASEY MUGGLESTON engaged in a scheme to obtain illegal profits by misappropriating and trading on material nonpublic information ("MNPI") concerning his insider knowledge that an energy company was getting close to publicly announcing the restart of a nuclear reactor. MUGGLESTON acquired the MNPI by virtue of his employment as a nuclear engineer for the energy company and exploited that MNPI in violation of the duties of trust and confidence owed to the energy company and its shareholders. MUGGLESTON profited over $1.4 million from his insider trading scheme.

### *Relevant Terms, Entities, and People*

2. A "call option" provides the buyer with the right, but not the obligation, to purchase shares of the underlying security at a specified price (the "strike price")

on or before the option's expiration date. The purchase of a call option is considered a "bullish" trade because the purchaser stands to benefit from an increase in the price of the underlying security.

3. An "out-of-the-money" call option involves an underlying security whose then-current market price is below the strike price of the option, i.e., the current stock price is lower than the price at which a trader would be able to buy the stock if the trader exercised the option. Out-of-the-money call options are generally less expensive than "in the money" call options and are typically used when a trader expects an upward move in the stock price, because if a call option is "out of the money" at the time of expiration, the call option becomes worthless and the holder of the option loses the entire amount invested.

4. The U.S. Securities and Exchange Commission ("SEC") defines "insider trading" to include "the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information." 17 C.F.R. § 240.10b5-1(a).

5. "Energy Company 1" was an American clean and renewable energy producer. Energy Company 1 operates nuclear, hydroelectric, wind, and solar generation facilities. Energy Company 1 was an issuer with securities registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and was required to file reports under Section 15(d) of the Exchange Act.

2

6.      Energy Company 1 securities were traded on the Nasdaq Stock Market ("Nasdaq"), an American stock exchange.

7.      Nuclear Reactor 1 was a nuclear reactor owned by Energy Company 1. It ceased operations in 2019.  On September 20, 2024, Energy Company 1 publicly announced its intention to restart Nuclear Reactor 1.

8.      Technology Company 1 entered into a Power Purchase Agreement ("PPA") with Energy Company 1 to buy all of the energy output produced by Nuclear Reactor 1.  The PPA was publicly announced on September 20, 2024.

9.      Brokerage Company 1 is a financial services company that allows customers to buy securities, including stock option contracts.

10.     MUGGLESTON was a Delaware resident and Energy Company 1 employee.  MUGGLESTON was a manager of an engineering team having responsibility over projects occurring at various nuclear power plants operated by Energy Company 1.  MUGGLESTON maintained a residence in Delaware, from which he routinely executed personal securities transactions through his account with Brokerage Company 1.  In his position as a manager at Energy Company 1, working on and in relation to nuclear power plants, MUGGLESTON obtained MNPI concerning Energy Company 1's efforts to restart Nuclear Reactor 1.

11.     Person 1 is MUGGLESTON's father.  Person 1 traded in Energy Company 1 "out-of-the-money" call options in August and September 2024.

12.     Person 2 is MUGGLESTON's brother.  Person 2 traded in Energy Company 1 "out-of-the-money" call options in July 2024.

3

13.    Person 3 is MUGGLESTON's cousin, who lived in close geographic proximity to Nuclear Reactor 1.

### *Energy Company 1's Insider Trading Policy*

14.    MUGGLESTON knew that he was prohibited from trading on the basis of MNPI and prohibited from trading call options on Energy Company 1's stock.

15.    Energy Company 1 required its employees to conduct an annual Code of Conduct training.  That training included a section covering Energy Company 1's Insider Trading Policy.

16.    The Insider Trading Policy (the "Policy") applied to all "Covered Persons," which the Policy defined as "all directors, officers, employees, trustees, agents or fiduciaries, independent contractors, and consultants of the Company, and their Related Persons." "Related Persons" included "any family members who do not live in your household but whose transactions in securities are directed by you or subject to your influence or control, such as parents or children who consult with you before they trade in securities[.]"

17.    The Policy defined "Insider Trading" as:

buying or selling securities "on the basis of" Material Non-Public Information . . . obtained through employment or other involvement with a company, or by providing MNPI to others outside the company ("tipping"). Buying or selling securities "on the basis of" Material Non-Public Information means that the person trading is aware of the information at the time of purchase or sale (regardless of whether the MNPI is the basis for the trade).

18.    The Policy defined "MNPI" as:

information which is both "material," and "nonpublic." Information is material if there is a substantial likelihood that, considering all of the surrounding facts and circumstances, a reasonable investor would consider such information important to a decision to buy, sell, or hold a security. Information is deemed

4

to be "non-public" until it has been disseminated by a method that is reasonably designed to provide broad distribution of the information to the public, usually by means of a press release, earnings call, or SEC filing.

19. The Policy contained explicit prohibitions against "Insider Trading," "Tipping," and the purchase and sale of Energy Company 1 "Call Options":

*Prohibition Against Insider Trading*. Insider trading is a criminal offense and a violation of Company policy, including the Code of Business Conduct. If a Covered Person has MNPI about the Company, he or she may not buy or sell [Energy Company 1] until the Company has broadly disseminated the MNPI to the public. In the event the Company issues a press release or makes an SEC filing disclosing all of the MNPI known to a Covered Person, the Covered Person and Related Persons may only trade in [Energy Company 1] Securities beginning on the second full trading day after such release or filing is made public.

*Prohibition Against Tipping*. A Covered Person must not share MNPI or information proprietary to the Company with Related Persons or anyone without a need to know, including family members, friends, and business associates. If a person receives MNPI from a Covered Person and uses that information to buy or sell securities, both the Covered Person and the person who used it may be deemed to have committed illegal insider trading, regardless of whether the Covered Person benefited personally from the other person's trading.

*Prohibition Against Short Sales and Put and Call Options*. Covered Persons and their Related Persons are prohibited from engaging in short sales and the purchase or sale of put and call options on [Energy Company 1] Securities.

20. MUGGLESTON certified on August 24, 2023, and August 26, 2024, that he had completed his annual code of conduct training, which included information about Energy Company 1's Insider Trading Policy.

### Energy Company 1's Project to Restart Nuclear Reactor 1

21. In late April and early May 2024, Energy Company 1 officials publicly acknowledged that the company was exploring the potential restart of Nuclear Reactor 1. Still, they emphasized that Energy Company 1 had not made any decisions

concerning its future.  Public news articles from June 2024 through August 2024 discussed the potential for Energy Company 1 to restart Nuclear Reactor 1.  Public comments from Energy Company 1, however, maintained that no decision had been made concerning a restart.

22.    Internally, by May 2024, Energy Company 1 had assembled teams to investigate the technical and economic feasibility of restarting Nuclear Reactor 1. Energy Company 1 employees selected to work on those teams, including MUGGLESTON, were informed that their work was "highly confidential" and that information about the potential restart of Nuclear Reactor 1 should be shared only on a "need to know" basis.

### *MUGGLESTON's Insider Trading Scheme*

23.    Through his position as an engineering manager at Energy Company 1, MUGGLESTON received MNPI concerning Energy Company 1's efforts to restart Nuclear Reactor 1.

24.    MUGGLESTON worked on an engineering team known as the License Renewal Group. The License Renewal Group was responsible for renewing the regulatory licenses for Energy Company 1's nuclear power plants. MUGGLESTON's supervisor informed MUGGLESTON and other engineering managers in May 2024 that, if Energy Company 1 were to restart Nuclear Reactor 1, the License Renewal Group would need to add a fourth team to support the project. A May 21, 2024, email to MUGGLESTON and others concerning the potential restart had "Confidential" in the subject line and "Please keep this very confidential" in the body of the email.

6

25. On May 24, three days after receiving that "Confidential" email, MUGGLESTON sent a message to Person 3 stating, "So it seems like the [Nuclear Reactor 1] restart is building steam. I'm trying to think of how to profit off this so started looking for real estate in the area." Later in the message, MUGGLESTON wrote, "No guarantees this will go through (a lot's riding on some major component inspections) but there's definitely a lot of energy behind it right now with some of the big dog executives camped out at [Nuclear Reactor 1] frequently over the past few weeks."

26. On May 24, 2024, Energy Company 1's stock price ended the day at approximately $230.63 per share.

27. On June 1, MUGGLESTON sent a message to Person 3 stating, "FYI, just heard that the decision on [Nuclear Reactor 1] is going to be made by the board during the next board meeting in June. Not sure the exact date but if they decide to move forward with it, then they'd likely announce this publicly pretty quickly after the decision. They'd have to start hiring a bunch of people to work on the restart[.]"

28. Over the following week, MUGGLESTON purchased his first "out-of-the-money" call option contracts on Energy Company 1 through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased[1] | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| June 3 | 5 | $7.80 | $230.00 | August 16 |
| June 3 | 8 | $6.50 | $220.00 | July 19 |
| June 3 | 10 | $2.75 | $220.00 | June 21 |
| June 4 | 10 | $1.55 | $220.00 | June 21 |
| June 4 | 2 | $4.80 | $220.00 | July 19 |

29.    On June 4, the day he purchased twelve "out-of-the-money" call option contracts for Energy Company 1, MUGGLESTON received an email from his supervisor containing the following: "I have been working on what that looks like for us if [the Nuclear Reactor 1 restart] is authorized by the board of directors. I will update the team as soon as can but will have a detailed discussion at our upcoming all hands meeting."

30.    As MUGGLESTON received internal progress updates about the potential restart of Nuclear Reactor 1 in June, MUGGLESTON continued to purchase Energy Company 1 "out-of-the-money" call option contracts through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| June 17 | 20 | $2.50 | $240.00 | July 19 |
| June 21 | 10 | $9.00 | $240.00 | August 16 |

---

[1]    Each call option contract provided MUGGLESTON the right but not the obligation to purchase 100 shares of Energy Company 1's stock at the strike price on or before the expiration date. For example, if a trader wanted to purchase 10 option contracts at a price of $1 per option, those 10 option contracts would cost the trader $1000 (i.e., 10 x 100 x $1).

| June 21 | 5 | $12.20 | $230.00 | August 16 |
| June 27 | 10 | $2.62 | $220.00 | July 19 |
| June 28 | 10 | $4.90 | $210.00 | July 19 |
| June 28 | 20 | $4.35 | $210.00 | July 19 |

31. On the last trading day of June, Energy Company 1's stock price ended the day at approximately $200.27 per share.

32. As MUGGLESTON received internal progress updates about the potential restart of Nuclear Reactor 1 in July, MUGGLESTON continued to purchase Energy Company 1 "out-of-the-money" call option contracts through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| July 17 | 10 | $2.90 | $220.00 | August 16 |
| July 17 | 10 | $2.40 | $220.00 | August 16 |
| July 17 | 10 | $4.00 | $220.00 | September 20 |

33. On July 17, the same day MUGGLESTON purchased 30 "out-of-the-money" call option contracts on Energy Company 1, Person 2 purchased two "out-of-the-money" call option contracts on Energy Company 1 with August 16 expiration dates for himself.

34. On July 30, Energy Company 1's board of directors authorized Energy Company 1's CEO—in his sole discretion—to approve an allocation of up to $1.5 billion to restart Nuclear Reactor 1 and to approve a PPA between Energy Company 1 and Technology Company 1.

9

35.    On July 31, Energy Company 1's stock price ended the day at approximately $181.80 per share.

36.    In early August, MUGGLESTON continued purchasing Energy Company 1 "out-of-the-money" call option contracts through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| August 8 | 10 | $4.00 | $210.00 | September 20 |
| August 9 | 50 | $0.70 | $200.00 | August 16 |

37.    On August 14, MUGGLESTON received an email from his supervisor concerning the need to update the License Renewal Group organization, including the need to dedicate a manager-level position to the Nuclear Reactor 1 restart. The email discussed the need to identify the additional staff required so that the License Renewal Group could "be ready once an announcement is made."

38.    That same day, MUGGLESTON purchased 20 "out-of-the-money" call option contracts on Energy Company 1 through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| August 14 | 1 | $1.40 | $220.00 | September 20 |
| August 14 | 19 | $1.40 | $220.00 | September 20 |

39.    On August 15, MUGGLESTON and a co-worker engaged in the following exchange:

Co-worker:        there is no "if" anymore!

MUGGLESTON:    no if for [Nuclear Reactor 1]?

40.    That same day, MUGGLESTON also received an email from his supervisor with the subject line, "Urgent..[Nuclear Reactor 1] Meeting." MUGGLESTON likewise exchanged messages with another co-worker that day, confirming his availability on August 16 to discuss the reorganization required by the Nuclear Reactor 1 restart.

41.    On August 16, MUGGLESTON also purchased more Energy Company 1 "out-of-the-money" call option contracts than he had ever previously purchased on a single day through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| August 16 | 50 | $1.30 | $220.00 | September 20 |
| August 16 | 100 | $0.65 | $230.00 | September 20 |

42.    On August 17, MUGGLESTON messaged Person 2 about the stock-price jump he was expecting to see in Energy Company 1's stock price based on the Nuclear Reactor 1 restart, saying, "I don't know if they'll even be successful getting the plant restarted but it doesn't really matter.  It will jump when the announcement is made."

43.    On August 18, MUGGLESTON's supervisor forwarded him an email conditionally approving staffing changes to account for the Nuclear Reactor 1 restart.

11

The forwarded email from a higher-ranking Energy Company 1 official stated, "Ok, im [sic] good with proceeding conditionally for internals.  We can start the process, but we are not posting any external until [the Nuclear Reactor 1 restart] public announcement is made."

44.     The next day, MUGGLESTON purchased more "out-of-the-money" call option contracts on Energy Company 1 through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| August 19 | 11 | $0.90 | $220.00 | September 20 |

45.     On August 20, MUGGLESTON and a co-worker had the following exchange:

MUGGLESTON:     I was going to ask about [the Nuclear Reactor 1 restart] but figured that wasn't a good idea

Co-worker:          haha hint hint – it won't be a long wait

46.     That same day, MUGGLESTON purchased 89 Energy Company 1 "out-of-the-money" call option contracts through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| August 20 | 19 | $1.20 | $220.00 | September 20 |
| August 20 | 20 | $2.55 | $210.00 | September 20 |
| August 20 | 50 | $0.45 | $230.00 | September 20 |

47.    On August 20, Person 1 also purchased 10 Energy Company 1 "out-of-the-money" call option contracts with a September 20 expiration date and $220.00 strike price for himself.

48.    On August 23, MUGGLESTON purchased additional Energy Company 1 "out-of-the-money" call option contracts through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| August 23 | 20 | $3.40 | $210.00 | September 20 |
| August 23 | 40 | $1.60 | $220.00 | September 20 |

49.    On August 26, MUGGLESTON received an email with staffing changes that would occur to the License Renewal Group should the Nuclear Reactor 1 restart move forward.

50.    On August 29 and 30, MUGGLESTON purchased more Energy Company 1 "out-of-the-money" call option contracts through his account with Brokerage Company 1, as set forth below:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| August 29 | 1 | $0.80 | $220.00 | September 20 |
| August 30 | 1 | $0.95 | $220.00 | September 20 |
| August 30 | 50 | $0.40 | $230.00 | September 20 |
| August 30 | 48 | $1.00 | $220.00 | September 20 |

13

51. On the last trading day of August, Energy Company 1's stock price ended the day at approximately $196.70 per share.

52. As MUGGLESTON was getting internal progress updates about the potential restart of Nuclear Reactor 1 in September, MUGGLESTON continued purchasing Energy Company 1 "out-of-the-money" call option contracts through his account with Brokerage Company 1:

| Approximate Purchase Date (2024) | Approximate Number of Call Option Contracts Purchased | Approximate Price per Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|
| September 3 | 100 | $1.20 | $200.00 | September 20 |

53. On September 3, the same day MUGGLESTON purchased 100 "out-of-the-money" call option contracts on Energy Company 1, Person 1 purchased 90 "out-of-the-money" call option contracts on Energy Company 1 with September 20 expiration dates and $220.00 strike prices for himself.

54. On September 3, Energy Company 1's stock price ended the day at approximately $177.78 per share.

55. Between September 3 and September 19, Energy Company 1's stock price increased to $208.50 per share.

56. On September 20, Energy Company 1 issued a public announcement that it was restarting Nuclear Reactor 1 and entering into a PPA with Technology Company 1. Energy Company 1's stock price ended the day at $254.98.

57. On September 20, MUGGLESTON sold approximately 550 Energy Company 1 call option contracts he held for a profit of approximately $1,480,380.67.

14

**Charging Paragraphs**

## COUNT 1
### (Securities Fraud)

58.     Paragraphs 2 through 57 of this Indictment are realleged as if fully set forth herein.

59.     From in or around May 2024 through at least in or around September 2024, in the District of Delaware and elsewhere, the defendant, CASEY MUGGLESTON, did knowingly, and with the intent to defraud, execute a scheme and artifice to (a) defraud one or more persons in connection with a security or an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, to wit, securities of Energy Company 1; and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, to wit, securities of Energy Company 1, that is, MUGGLESTON engaged in a scheme to defraud Energy Company 1 and one or more members of the investing public by obtaining material nonpublic information through his position as engineering manager at Energy Company 1 and then converting that information to his own use to execute, and cause and assist others, including Person 1 and Person 2, to execute, one or more securities transactions in Energy Company 1.

All in violation of 18 U.S.C. §§ 1348 & 2.

## COUNTS 2–5
### (Insider Trading)

60.    Paragraphs 2 through 57 of this Indictment are realleged as if fully set forth herein.

61.    On or about the dates specified as to each count below, in the District of Delaware and elsewhere, the defendant, CASEY MUGGLESTON, did willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and the facilities of a national securities exchange, in connection with the purchase and sale of securities, use and employ one or more manipulative and deceptive devices and contrivances, in violation of 17 C.F.R. § 240.10b-5 by: (a) employing one or more devices, schemes, and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, that is, in violation of his duties of trust and confidence to Energy Company 1 as a managing engineer at Energy Company 1, MUGGLESTON knowingly and willfully executed and caused to be executed the respective securities transactions through his account with Brokerage Company 1 listed next to each count below, on the basis of material nonpublic information:

16

*Specific Transactions*

| Count | Approximate Purchase Date (2024) | Approximate Number of Energy Company 1 Call Option Contracts Purchased | Approximate Price per Energy Company 1 Call Option | Strike Price | Expiration Date (2024) |
|---|---|---|---|---|---|
| 2 | July 17 | 10 | $4.00 | $220 | September 20 |
| 3 | August 14 | 19 | $1.40 | $220 | September 20 |
| 4 | August 16 | 100 | $0.65 | $230 | September 20 |
| 5 | August 30 | 50 | $0.40 | $230 | September 20 |

All in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5.

**Notice of Forfeiture**

Upon conviction of any of the counts charged in this Indictment, the defendant, CASEY MUGGLESTON, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, $1,480,380.67.

///

17

If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

A TRUE BILL:

_____
FOREPERSON

Benjamin L. Wallace
United States Attorney

By: _____
Corey J. Hauser
Bryan C. Williamson
Assistant United States Attorneys

Dated: June 23, 2026

18